UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CB 2010 LLC,

                Plaintiff,

v.                                        Case Number 12-13930

                                        Honorable Thomas L. Ludington

ITHACA COATINGS, et al.,

                Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

In federal court, unlike in the nation's pastime, the moving party does not enjoy an inherent advantage. A tie isn't sufficient to win summary judgment. Rather, the movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Here, the movant makes this showing on the counterclaim, but not the complaint. It is therefore entitled to partial summary judgment.

The case arises out of two loans that Citizens Bank made to Defendants Ithaca Coatings, Inc., and Randolphs, LLC. The loans were personally guaranteed by Defendants Larry and Terrie Randolph. Citizens Bank assigned its rights in the loans to Plaintiff CB 2010 LLC.

Plaintiff then brought this suit against Defendants alleging that they are in default. Mr. and Mrs. Randolph counterclaimed asserting that requiring the guarantees violated the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691–1691f. Plaintiff now moves for summary judgment on both its complaint and the Randolphs' counterclaim.

To support its contention that Defendants defaulted, Plaintiff offers an affidavit from one of its agents. Nothing else. Defendants, in turn, offer an affidavit denying that they defaulted.

Plaintiff is not entitled to summary judgment on its complaint, but is entitled to summary judgment on the counterclaim. As detailed below, the undisputed evidence is that Mr. and Mrs. Randolph's guarantees waive their rights under the Equal Credit Opportunity Act. Accordingly, the motion will be granted in part and denied in part.

## I

## A

This case, as noted, arises out of two loans. Both were executed in November 2007. Citizens secured each with belt and suspenders.

### 1

In the first loan, Citizens Bank loaned Ithaca Coatings and Randolphs, LLC $1,992,000 ("Loan 1"). The loan has a five-year term, running from December 2007 through November 2012. Repayment of the loan begins with 59 consecutive monthly payments of $17,713.24. It ends at month 60 with a single balloon payment for the balance of the unpaid principal and accrued interest (estimated to be $1,555,259.11).

#### a

Under the loan agreement, Ithaca and Randolphs, LLC are required to regularly furnish Citizens with financial statements and tax returns. Specifically, the loan agreement requires those entities give Citizens: (1) quarterly corporate financial statements compiled by a certified public accountant; (2) annual corporate financial statements compiled by a certified public accountant; (3) annual corporate tax returns; (4) annual personal financial statements of Mr. and Mrs. Randolph; and (5) annual personal tax returns of Mr. and Mrs. Randolph.

**b**

A default occurs under ten enumerated circumstances, the loan agreement provides. Three are pertinent to the present dispute.

**i**

First, a "payment default" occurs if "Borrower fails to make any payment when due under the Loan."

Second, an "insolvency" default occurs if there is a "dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower."

And third, an "adverse change" default occurs if there is "[a] material adverse change . . . in Borrower's financial condition, or lender believes the prospect of payment or performance of the Loan is impaired."

**ii**

In the event of default, Citizens Bank has the right to accelerate the indebtedness, subject to a right to cure. Specifically, the agreement provides that if a default occurs, "except where otherwise provided in this Agreement or the Related documents, . . . at Lender's option, all indebtedness immediately will become due and payable, all without notice of any kind to Borrower."

One such "otherwise provided" clause is the "right to cure" subsection of the loan agreement, which provides in somewhat cryptic terms:

> If any default, other than a default on indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default

-3-

within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practicable.

(The term "indebtedness" is defined in the agreement's definitions section; it "means the indebtedness evidenced by the Note or Related Documents, including all principal and interest." The phrase "default on indebtedness," however, is not a defined term.  Nor is it one of the 10 specifically enumerated "events of default."  )

<strong>c</strong>

The loan agreement also contains a choice-of-law clause and an attorneys' fees clause. The former provides: "This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Michigan."  And the latter provides: "Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this agreement."

<strong>2</strong>

In the second loan, Citizens extended Ithaca an operating line of credit of $250,000 ("Loan 2").  Under the loan agreement (of Loan 1), Defendants were required to pay down this line of credit annually to a zero balance.

<strong>B</strong>

The loans were well secured by Citizens.  First, Citizens obtained promissory notes from Ithaca and Randolphs, LLC.  The notes contain the same provisions regarding default, choice-of-law, and attorneys' fees as the loan agreement (quoted above).

-4-

Additionally, Loan 1 was collateralized with four commercial real estate mortgages, a pledge of the business assets of Ithaca Coatings, and guarantees of Mr. and Mrs. Randolph and Randolphs, LLC.

**1**

Mr. and Mrs. Randolph's personal guarantees promise to repay any amounts due Citizens from Ithaca or Randolphs, LLC (or both).

The guarantees represent that they are being executed at the request of Mr. and Mrs. Randolph (not Citizens Bank), providing: "Guarantor represents and warrants Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guarantee; (B) this Guarantee is executed at Borrower's request and not at the request of Lender."

The guarantees also provide a number of waivers and warranties.  For example, Mr. and Mrs. Randolph waive "any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness."  Likewise, Mr. and Mrs. Randolph waive "any deductions to the amount guaranteed under this Guarantee for any claim of setoff, counterclaim, counter demand, recoupment or similar right."  And Mr. and Mrs. Randolph warrant "that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law."

Finally, the guarantees contain an integration clause providing: "Guarantor further agrees that Guarantor has read and fully understands the terms of this Guarantee; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty

fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guarantee."

## 2

Randolphs, LLC's guarantee likewise promises that "absolutely and unconditionally guarantees full and punctual payment and satisfaction of Indebtedness of Borrower." And the guarantee contains the same material representations, warranties, and waivers as Mr. and Mrs. Randolph's personal guarantees.

## C

These documents were executed, as noted, in November 2007. This much is undisputed. What followed, however, is far less settled.

## 1

Defendants assert that in September 2008 they received a notice of default from Citizens Bank. *See* Randolphs Aff. Ex. A (copy of notice), *attached as* Defs.' Resp. to Pl.'s Mot. Summ. J. Ex. 3.

Dated September 10, 2008, the notice identifies two grounds for Defendants' default: insolvency and a material adverse change in financial condition (but not failure to make monthly payments). It explains:

> A.    The Borrower is insolvent based on the 6/30/08, CPA Compiled statement provided to Bank.
>
> B.    The Borrower has shown a material adverse change in financial condition with 6/30/08, CPA Compiled statement provided to Bank.
>
> As a consequence of these defaults, the Bank has elected to declare a default, and is providing a 10 day cure period to cure the defaults cited above. If the defaults are not cured by the end of day, September 22, 2008, default rates will be invoke [sic].

Notice of Default 2; *see also* Randolphs Aff. ¶ 8; *but see* Hunter Aff. ¶¶ 13–14 (Plaintiff's attorney-in-fact asserting that the default was based on Defendants "failing to make monthly required payments under the loan"), *attached as* Pl.'s Mot. Summ. J. Ex. A; Compl. ¶¶ 25–26, 29–30 (same).

## 2

What happened next is not altogether clear from the record (though there is general agreement that the parties attempted to work through the concerns of Citizens Bank).

### a

Plaintiff does not mention the notice of default in its papers.  It does, however, assert that Defendant was in fact in default around this time (albeit not for the reasons cited in the default notice[1]).

Plaintiff further asserts that sometime in 2009 (Plaintiff does not specify precisely when) Citizens entered into "a series of written forbearance agreements with Defendants."  Hunter Aff. ¶ 13 ("Beginning in 2009, by which time Defendants had defaulted on their obligations under the Loan Documents, as an accommodation to Defendants, Citizens, and later CB 2010, entered into a series of written forbearance agreements with Defendants to provide Defendants with the opportunity to address their defaults.").

Plaintiff does not make copies of the alleged forbearance agreements part of the record.  Nor does Plaintiff identify any of the agreements' terms.

---

[1] *See* Hunter Aff. ¶¶ 13–14 (asserting that Defendants defaulted by not making the monthly payments); Compl. ¶¶ 25–26, 29–30 (same).

**b**

Defendants dispute that they were in default.  *See* Randolphs Aff. ¶¶ 8–9.  They agree, however, Citizens alleged that they were and then agreed to work with them.  *See, e.g.*, *id*. ¶ 9 ("Representatives of Citizens directed us to make payments on the loans and advised us not to worry about any claimed 'default' because they would work with us.  We also, at Citizens direction, made a substantial payment on the line of credit to resolve any concerns regarding . . . solvency.").

**3**

Again, what happened after the parties agreed to work together to resolve Citizens' concerns is disputed.  Plaintiff asserts that, notwithstanding the forbearance agreements, "Defendants failed to adequately address those defaults[,] . . . failing to make monthly required payments."  Hunter Aff. ¶¶ 12–13; *see id*. ¶ 14.

Defendants dispute this, asserting that they "made payments on the loans, which were accepted by the Plaintiff without qualification after the Plaintiff's claim of default and acceleration."  Randolphs Aff. ¶ 10.

**4**

It is undisputed that in 2010 Citizens assigned its rights in the loan to Plaintiff.  *See* Hunter Aff. ¶ 10.  Plaintiff asserts that it too entered into "written forbearance agreements" with Defendants.  *Id*. ¶ 12 (quoted above).  Again, Plaintiff does not make copies of these agreements part of the record.  Nor does Plaintiff specify the terms of the alleged agreements.  Sometime later (Plaintiff does not specify when), Defendants again defaulted on their obligations.  *Id*. ¶¶ 12–14.

-8-

Defendants dispute this, asserting that they have fully performed their obligations.  *See, e.g.*, Randolphs Aff. ¶¶ 9–10 (quoted above).

## D

It is undisputed that Plaintiff sent Defendant "[n]o new subsequent claims of default and acceleration."  *Id.*  Instead, Plaintiff filed suit against Defendant in this Court on September 5, 2012.[2]

Invoking the Court's diversity jurisdiction, the complaint alleges that Defendants breached their agreements "failing to pay CB 2010 the amounts due."  Compl. ¶¶ 25, 29.  (No mention is made of default based on insolvency or a material adverse change in financial condition.)  The complaint further alleges that the total due under Loan 1 is $1,900,083, plus interest; the total due under Loan 2 is $248,525, plus interest.

The Randolphs counterclaimed, asserting that Citizens Bank required the personal guarantees without checking whether the businesses met the lender's standard of creditworthiness, violating the Equal Credit Opportunity Act.

Plaintiff moves for summary judgment on its complaint and the Randolphs' counterclaim.

## II

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  The court must view the

---

[2] This was about two months before the conclusion of the term of Loan 1.

evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III

### A

Plaintiff first moves for summary judgment on its breach of contract claims.

### 1

A federal court sitting in diversity applies the choice-of-law rules of the state in which the court sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941). Here, that state is Michigan.

Michigan follows the approach of the *Restatement (Second) of Conflict of Laws*, which generally "permits the application of the parties' choice of law." *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 703–04 (Mich. 1995) (citing *Restatement (Second) of Conflict of Laws* § 187 (1971)).[3] Here, the parties chose to be governed by Michigan law.

### 2

Breach of contract claims under Michigan law have three elements: (1) a valid contract;[4] (2) a breach of that contract; and (3) damages. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (citing *Platsis v. E.F. Hutton & Co., Inc.*, 642 F. Supp. 1277, 1309 (W.D. Mich. 1986)). Here, a genuine dispute as to the second element exists.

---

[3] This rule is subject to two exceptions, neither of which is applicable in this case. *See Chrysler Corp.*, 528 N.W.2d at 703–04. The choice-of-law provision is enforceable.

[4] Establishing a valid contract requires showing: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Thomas v. Leja*, 468 N.W.2d 58, 60 (Mich. Ct. App.1991) (citing *Detroit Trust Co. v. Struggles*, 286 N.W. 844 (Mich.1939)).

Plaintiff, as noted, asserts that Defendants defaulted on their obligations (and therefore breached the loan agreements) "by failing to make monthly required payments." Hunter Aff. ¶¶ 13–14. The only evidence that Plaintiff offers in support of its assertion that Defendants defaulted on their obligation is the affidavit of Plaintiff's "attorney-in-fact," Mitchell Hunter. *See* Pl.'s Mot. Ex. A (attaching affidavit).

Defendants, however, offer the Randolphs' affidavit denying that they defaulted by not making required monthly payments. And Defendants offer a copy of the default notice sent by Plaintiff. Together, this evidence is more than sufficient to create a genuine issue for trial.

To elaborate, Defendants' affidavit asserts "the loans were not defaulted due to 'payment defaults. ' Rather, on September 10, 2008 the Plaintiff notified [Defendants] that the loans were in default because Ithaca and the Randolphs were insolvent . . . and had shown a material adverse change in financial condition." Randolphs Aff. ¶ 8 (quotation marks omitted). And the copy of the notice of default corroborates Defendants' version of the facts. *Id*. Ex. A.

The Randolphs' affidavit further expressly disputes "such defaults." Randolphs Aff. ¶ 9. And the affidavit asserts that after receiving the notice of default, Defendants "made payments on the loans, which were accepted by the Plaintiff without qualification after the Plaintiff's claim of default and acceleration. No new subsequent claims of default and acceleration were issued by the Plaintiff." *Id*. ¶ 10 (internal citation omitted).

In short, Plaintiff's breach of contract case is presently one of dueling affidavits. On summary judgment, such duels end one way. A draw, heading for trial. *See, e.g*., *Copenhaver v. Mich. Dep. of Corr.*, 05-CV-73286, 2007 WL 2406925, at *6 (E.D. Mich. Aug. 20, 2007) (Friedman, C.J.) ("Where, as here, the motion essentially involves a credibility contest between the parties' versions of events as set forth in their affidavits, summary judgment is not

appropriate." (citing *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990)); *see also Willis v. Shelby Cnty., Tenn.*, 05-2625B, 2008 WL 901487, at *4 (W.D. Tenn. Mar. 31, 2008) ("These conflicting affidavits raise obvious factual disputes, which the Court cannot resolve at the summary judgment stage."); *see generally* 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2738 (3d ed. 1998) ("Since the function of the judge when resolving a summary-judgment motion is to determine if a genuine factual dispute exists, affidavits may not be employed to resolve disputed factual issues.").

Because a genuine dispute exists about whether Defendants defaulted on the loans, Plaintiff is not entitled to summary judgment on its breach of contract claims.

## B

Plaintiff also moves for summary judgment on the Randolphs' Equal Credit Opportunity Act counterclaim, asserting that it is barred by the guarantees' waivers. This is a closer question.

## 1

In the early 1970s, Congress held a number of hearings on "discriminatory credit practices that allegedly were prevalent across the nation. Most of the evidence presented centered on the inability of women to obtain credit on the same basis as men." Joel D. Stafford, *Consumer Protection: The Equal Credit Opportunity Act: Guarantors As Applicants-Did the Cost of A Violation Go Up?*, 40 Okla. L. Rev. 431, 431 (1987).

The product of those hearing was the Equal Credit Opportunity Act of 1974, 15 U.S.C. §§ 1691–1691f ("ECOA"), which prohibited creditors from discriminating on the basis of sex or marital status. 15 U.S.C. § 1691(a) (amended 1976).

The purpose, the Sixth Circuit explains, was "to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for

individual credit." *Mays v. Buckeye Rural Elec. Co-op., Inc.*, 277 F.3d 873, 876 (6th Cir. 2002)

(quoting *Anderson v. United Fin. Co*., 666 F.2d 1274, 1277 (9th Cir. 1982)); *see generally* Earl

Maltz & Fred Miller, *The Equal Credit Opportunity Act and Regulation B*, 31 Okla. L. Rev. 1

(1978); Stafford, *supra*, at 431 ("[T]he drafters intended similarly situated creditworthy married

and unmarried adults to be treated equally when applying for individual credit."). In this, the

Sixth Circuit observes, the ECOA has a similar purpose as Title VII of the Civil Rights Act of

1964. *Mays*, 277 F.3d at 876 (citing *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 406 (6th Cir.

1998).

Discrimination in lending, however, was not confined to women. So two years later

Congress expanded the ECOA to protect against discriminatory lending practices on the basis of

race, color, religion, national origin, and age. *See generally* Maltz & Miller, *supra*, at 2

(collecting sources). Protection was also extended to those whose income is derived from public

assistance programs and those exercising their rights under the CCPA. *Id*. Today, the ECOA

provides:

> **It shall be unlawful for any creditor to discriminate against any applicant, with
> respect to any aspect of a credit transaction** —
>
> (1)     on the basis of race, color, religion, national origin, sex or marital status,
>         or age (provided the applicant has the capacity to contract);
>
> (2)     because all or part of the applicant's income derives from any public
>         assistance program; or
>
> (3)     because the applicant has in good faith exercised any right under this
>         chapter.

15 U.S.C. § 1691(a)(1)–(3). The ECOA also expressly directs the Federal Reserve Board to

prescribe regulations "to carry out the purposes" of the ECOA. § 1691(a). And the Federal

Reserve has done so with Regulation B, 12 C.F.R. §§ 202.1–202.17.

One of those regulations provides that "a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested."  12 C.F.R. § 202.7(d)(1). (This is the regulation the Randolphs allege that Plaintiff has violated.)

**2**

Given the statutory backdrop of the ECOA — it is one part of "a comprehensive consumer-protection statute," *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S. Ct. 1605, 1616 n.11 (2010)  — it is not obvious that Congress intended the act to apply to commercial lenders, much less guarantors of commercial loans.

The text of the ECOA, however, does not limit its scope to consumer transactions.  As noted, the statute prohibits discrimination against "any applicant," not merely consumer applicants.  § 1691(a) (quoted above); *see generally* Maltz & Miller, *supra*, at 2 (contrasting ECOA with Truth in Lending Act).  And Regulation B has not cabined the statute's scope to such transactions. *See, e.g.*, 12 C.F.R. §§ 202.2(e) ("Applicant means any person who requests or who has received an extension of credit from a creditor.");  202.2(g) ("Business credit refers to extensions of credit primarily for business or commercial (including agricultural) purposes.").

Likewise, although the text of the statute does not make it immediately obvious that an "applicant" for a loan includes a guarantor, the Federal Reserve Board's implementing regulations have defined credit "applicants" to include guarantors.  *See, e.g.*, 12 C.F.R. §§ 202.2(e) ("Applicant . . . includes guarantors."); *but see generally Moran Foods, Inc. v. Mid-Atl. Mkt. Dev. Co., LLC*, 476 F.3d 436, 441 (7th Cir. 2007) ("The Federal Reserve . . . has defined

'applicant' for credit (the term in the statute) to include a guarantor. We doubt that the statute can be stretched far enough to allow this interpretation." (citations omitted)).

Thus, the Randolphs' guarantee comes within the scope of the ECOA (at least as that scope is defined by the implementing regulations).

The question is whether the Randolphs can waive that protection and, if so, whether they have. For the reasons that follow, they can and have.

### 3

The Sixth Circuit has not yet had occasion to expressly decide whether a person can waive the protections of the ECOA. The parties themselves cite no authority addressing this particular question. And an independent review reveals district court, but not appellate authority, on the question. *See Pocopson Indus., Inc. v. Hudson United Bank*, CIV.A. 05-6173, 2006 WL 2092578, at *6 (E.D. Pa. July 26, 2006) (holding waiver of ECOA rights is enforceable); *Stornaway Props., Inc. v. Moses*, 76 F. Supp. 2d 607, 615 (E.D. Pa. 1999) (same); *Wetzler v. Cantor*, 202 B.R. 573, 578 (D. Md. 1996) (same); *cf. Truckenbrodt v. First Alliance Mortg. Co.*, 96 C 1822, 1996 WL 422150, at *2 (N.D. Ill. July 24, 1996) ("There is no indication that Congress intended to preclude a waiver of judicial remedies under the ECOA.").

Nevertheless, the Sixth Circuit's guidance on the waivability of other federal rights is instructive. In the particular context of Title VII, for example, the court distinguishes between prospective waivers and other types of waivers. *Compare Williams v. Vukovich*, 720 F.2d 909, 926 (6th Cir. 1983) (prohibiting prospective waiver of rights under Title VII), *with Shaheen v. B.F. Goodrich Co.*, 873 F.2d 105, 107 (6th Cir. 1989) (permitting retrospective waiver of rights under Title VII); *cf. Mays*, 277 F.3d at 876 (noting that because the ECOA and Title VII share "similar purposes," Title VII provides "an analytical framework" for ECOA claims).

-15-

With a prospective waiver, a person "waives rights protecting against conduct that has not yet occurred." *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 584 (6th Cir. 1995).  Such a waiver, the Sixth Circuit instructs, must be "particularly scrutinized as to the intent of the parties."  *Id*.

In contrast, with a retrospective waiver a person waives rights protecting against conduct that has already occurred.  *Shaheen*, 873 F.2d at 107.  With a contemporaneous waiver, a person waives rights protecting against conduct that is continuing to occur.  *See Adams*, 67 F.3d at 584.  Both retrospective and contemporaneous waivers are interpreted according to "normal contract principles."  *Shaheen*, 873 F.2d at 107; *see also Adams*, 67 F.3d at 584 (noting that when a waiver "incorporates the future effects of prior discrimination, it effectively bars new discrimination claims based on post-settlement conduct that stems directly from, or is a continuing effect of, past discrimination").  Such waivers, if knowingly and intelligently made, "will be enforced absent the typical exceptions for fraud, duress, lack of consideration or mutual mistake."  *Shaheen*, 873 F.2d at 107.

Here, the Randolphs' waiver of their rights under the ECOA was not prospective, but retrospective.  The conduct at issue was Citizens Bank obtaining a personal guarantee from the Mr. and Mrs. Randolph without first determining whether Ithaca and Randolphs, LLC qualified under Citizens Bank's standards of creditworthiness for the amount and terms of the credit requested.  *See* 12 C.F.R. § 202.7(d)(1) (quoted above).

This conduct had already occurred at the time Mr. and Mrs. Randolph agreed to waive "any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness" and "any claim of setoff, counterclaim, counter demand, recoupment or similar right."

Moreover, in their guarantees Mr. and Mrs. Randolph warrant "that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences." And the guarantees contain an integration clause providing: "Guarantor further agrees that Guarantor has read and fully understands the terms of this Guarantee; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guarantee."

By its express terms, Mr. and Mrs. Randolph's guarantees provide that the waivers were knowingly and intelligently made. There is no allegation that the waivers were procured by fraud, duress, lack of consideration, or mutual mistake. They are enforceable.

Reinforcing this conclusion, of course, are the district court opinions collected above finding a waiver of ECOA rights is enforceable. *E.g.*, *Pocopson Indus.*, 2006 WL 2092578, at *6 (E.D. Pa. July 26, 2006); *Stornaway Props.*, 76 F. Supp. 2d at 615; *Wetzler*, 202 B.R. at 578. Plaintiff is entitled to summary judgment on the Randolphs' counterclaim.

**4**

Arguing against this conclusion, the Randolphs write: "At a minimum, there is a question of fact as to how and why the guarantees were procured. Conspicuously absent from the Plaintiff's motion is an affidavit from the Citizen Bank loan officer indicating: (1) that Ithaca's and Randolphs' [applications] were denied for failure to meet the Plaintiff's standard of credit worthiness [sic] and available security; and/or (b) that the guarantees at issue were offered by the Defendant Guarantors (as alleged)."

Essentially, the Randolphs are arguing that a question of fact exists as to whether the ECOA was violated. As detailed above, however, the question is not whether the ECOA was

violated, but whether the Randolphs waived their rights under the ECOA protection.  For the reasons discussed above, they have.  Plaintiff is entitled to judgment as a matter of law on the counterclaim.

**IV**

Accordingly, it is **ORDERED** that Plaintiff's motion for summary judgment (ECF No. 12) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the Randolphs' counterclaim is **DISMISSED**.


Dated: May 22, 2013                                        s/Thomas L. Ludington
                                                          THOMAS L. LUDINGTON
                                                          United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 22, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS
